LAERDAL MEDICAL CORPORATION

v.

AMBU, INC.

Civ. No. K–94–2557.

United States District Court,
D. Maryland.

Feb. 14, 1995.

Albert J. Breneisen, John Flock, Donna M. Praiss, and Kenyon & Kenyon, New York City, P. McCoy Smith, Frank Pietrantonio, and Kenyon & Kenyon, Washington, DC, and Marleen B. Miller, and Levin and Gann, Baltimore, MD, for plaintiff.

Paul Grandinetti, and Levy, Zito & Grandinetti, Washington, DC, Alan Reitzfeld, Erica Kay Donoho, Michael S. Mitchell, and Haight, Gardner, Poor & Havens, New York City, and William D. Hall, Potomac, MD, for defendant.

FRANK A. KAUFMAN, Senior District Judge.

Plaintiff Laerdal Medical Corporation (hereinafter "Laerdal") instituted this litigation against defendant Ambu, Inc. (hereinafter "Ambu") for infringement of Laerdal's patent covering a cervical extrication collar, willful infringement of that patent, unfair competition and patent mismarking. Defendant Ambu has counterclaimed, asserting unfair competition/trade disparagement by Laerdal. Previously, this Court has denied a number of motions for summary judgment with regard to those claims and counterclaims, concluding that genuine issues of material fact are in dispute.[1] At this time, this case is currently scheduled for trial to com-

---

1. Both parties had moved for summary judgment with regard to plaintiff's claim of patent infringement. Each argued that there was no genuine issue of material fact in dispute as to literal infringement or as to infringement under the doctrine of equivalents, differing, of course, as to whether the facts indisputably pointed to infringement or noninfringement. Defendant Ambu also based its summary judgment motion on the argument that plaintiff's patent was inval-

id under the doctrine of prior art. Defendant further submitted summary judgment motions with regard to the claims against it for willful infringement and patent mismarking, while plaintiff additionally moved for summary judgment in connection with the counterclaims against it for unfair competition/trade disparagement. As noted *supra,* all of the aforementioned summary judgment motions have been denied by this Court.

mence shortly. However, a specific issue has presently arisen concerning whether or not the Patent and Trademark Office (hereinafter "PTO") improperly reinstated the patent involved herein after that patent had expired for nonpayment of required maintenance fees. With regard to that issue, Ambu has now moved for partial summary judgment with respect to Laerdal's patent infringement claim (Count I of the Amended Complaint). Laerdal has filed a cross-motion for partial summary judgment, seeking an order that the actions of the PTO render the patent-in-suit neither invalid nor unenforceable.

## I

In 1980, Congress passed an amendment to the Patent Act, 35 U.S.C. § 41 *et seq.*, which provided, *inter alia,* for a patentee to pay periodic fees in order to maintain the enforceability of its patent. Pursuant thereto, the Commissioner was required administratively to establish the maintenance fees at a monetary level which eventually would enable the PTO to recover 25% of its estimated patent processing costs. *See* 3 Donald S. Chisum, *Patents: A Treatise on the Law of Patentability, Validity and Infringement* § 11.02[1], at 11–25 (1994). The Act was amended again in 1982, by which amendment the maintenance fee levels for patents applied for on or after August 27, 1982 were set at specified figures. *See* 35 U.S.C. § 41(b).[2]

The legislative history of the 1980 and 1982 amendments reveals that the purpose of implementing such a maintenance fee system was to have patent owners pay for certain operations of the PTO. *See also* Chisum, *supra,* at 11–25.[3]

Effective October 1, 1982, Congress further amended the Patent Act in 35 U.S.C. § 41(c)(1) to provide that:

> The Commissioner may accept the payment of any maintenance fee required by

2. 35 U.S.C. § 41(b) provides:
The Commissioner shall charge the following fees for maintaining a patent in force:
1. Three years and six months after grant, $400.
2. Seven years and six months after grant, $800.
3. Eleven years and six months after grant, $1,200.
Unless payment of the applicable maintenance fee is received in the Patent and Trademark Office on or before the date the fee is due or within a grace period of six months thereafter, the patent will expire as of the end of such grace period. The Commissioner may require the payment of a surcharge as a condition of accepting within such six-month grace period the late payment of an applicable maintenance fee. No fee will be established for maintaining a design or plant patent in force.

3. The legislative history of the 1980 amendments indicates:

> Section 2 of the bill would restructure and modernize completely section 41 of title 35, United States Code—the basic fee provision of the patent laws.
> The committee recognizes that the PTO, in issuing patents and registering trademarks, performs a significant public service in implementing the Federal patent and trademark laws and also confers benefit on private persons who seek to protect their intellectual property. The Committee, therefore, supports the premise that patent applicants and those seeking to register trademarks should bear a significant share of the cost of the operating the PTO by the payment of fees ...
> The committee inserted the word "actual" in this legislation to describe those costs which should be assumed 50 percent by applicants. Patent applicants should bear through the payment of fees, 25% in processing of fees, and 25% in maintenance fees, the cost of the patent examiners and their clerical support, as well as quality review, appeals, interferences, and patent printing, including internal PTO printing costs ...

H.R.Rep. No. 1307(I), 96th Cong., 2d Sess., 8–9 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460, 6467–68.
The legislative history also states:
> In order further to soften the impact on small business and individual inventors, the fees are to be paid in four installments over the life of the patent. This system, known as maintenance fees, is in use in most advanced industrial nations and has the advantage of deferring payment until the invention begins to return revenue to the inventor. Should the invention prove to have no commercial value, the inventor has the option of permitting the patent to lapse, thus avoiding all further fees.

H.R.Rep. at 4–5, U.S.C.C.A.N. at 6463–64.
The legislative history of the 1982 amendment further reveals:
> The overall objective of H.R. 6260 is to provide for increased user support for the Patent and Trademark Office costs associated with the actual processing of patent applications by fiscal year 1996.

H.R.Rep. No. 542, 97th Cong., 2d Sess. 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 765, 766.

subsection (b) of this section after the six-month grace period if the delay is shown to the satisfaction of the Commissioner to have been unavoidable. The Commissioner may require the payment of a surcharge as a condition of accepting payment of any maintenance fee after the six-month grace period. If the Commissioner accepts payment of a maintenance fee after the six-month grace period, the patent shall be considered as not having expired at the end of the grace period.

The legislative history regarding the unavoidability exception includes statements by the House Committee that "Section 3(d) also permits the Commissioner of Patents to accept late payment of maintenance fees where it is established that the delay in payment was unavoidable"[4], and that "(i)n order to

4. H.R.Rep. No. 542 at 3, 1982 U.S.C.C.A.N. at 767.

5. H.R.Rep. No. 542 at 8, 1982 U.S.C.C.A.N. at 772.

35 U.S.C. § 41(c)(1) was again amended in 1992. That amendment took effect October 23, 1992, after the events in the within case occurred. In accordance with that amendment, § 41(c)(1) now reads:

The Commissioner may accept the payment of any maintenance fee required by subsection (b) of this section which is made within twenty-four months after the six-month grace period if the delay is shown to the satisfaction of the Commissioner to have been unintentional, or at any time after the six-month grace period if the delay is shown to the satisfaction of the Commissioner to have been unavoidable. The Commissioner may require the payment of a surcharge as a condition of accepting payment of any maintenance fee after the six-month grace period. If the Commissioner accepts payment of a maintenance fee after the six-month grace period, the patent shall be considered as not having expired at the end of the grace period.

The legislative history with regard to that amendment states:

Under present law, patentees have a six-month grace period after the payment due date to pay the maintenance fee, and any additional surcharge, before the patent expires. After the six month grace period, the patentee must convince the Commissioner of the Patent and Trademark Office that the failure to pay was "unavoidable" in order to have the patent remain in force. The Commissioner can consider such requests for payment of late maintenance fees anytime after the expiration of the six-month grace

avoid an inequitable loss of patent rights, the Commissioner is given the authority to accept payment of any maintenance fee after the six-month grace period if it is established that the delay in payment was unavoidable. It is intended that the Commissioner will issue regulations establishing guidelines for acceptance of a late payment. After the expiration of a reasonable period of time, the patentee would bear a heavy burden of proof that the delay was unavoidable".[5]

## II

The PTO issued U.S. Patent No. 4,413,619 to Mr. Geoffrey Garth, inventor of the patent-in-suit, on November 8, 1983. Garth later received a re-issue of that patent, U.S.

period up until the expiration of the original 17-year patent.

The "unavoidable" standard has proved to be too stringent in many cases. Many patentees have been deprived of their patent rights for failure to pay the maintenance fees for reasons that may have been unintentional yet not unavoidable.

Under the amendment in the nature of a substitute as adopted by the Committee, patent owners still will have the six month grace period to pay the maintenance fees without any adverse consequences. The new unintentional standard would be applicable for a twenty-four month period after the six month grace period. After the expiration of the six month grace period, the Commissioner of the Patent and Trademark Office can accept late payments for twenty-four additional months after the six month grace period if the delay in payment was either unintentional or unavoidable. After the expiration of the twenty-four months, the Commissioner can accept late payments of maintenance fees only if the delay was unavoidable.

H.R.Rep. No. 993, 102nd Cong., 2d Sess., 2 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1623, 1623–24.

As previously noted, the effective date of this amendment renders it inapplicable to the instant controversy. Furthermore, in this case, the passage of time between the expiration of the six month grace period on November 8, 1987 and the attempted submission of the required fee on January 23, 1990 was longer than 24 months, so that even if this amendment had been applicable to the instant controversy, the standard to be considered would have been unavoidability. However, to the extent that the amendment and its legislative history illuminate the meaning and purpose of the 1982 version of the statute, the same have been considered by this Court.

Patent No. Re. 32,219, on August 5, 1986.[6] The first maintenance fee in connection with the re-issue patent was due to be paid on May 8, 1987, three years and six months after the *original* patent issued. Consequently, the grace period for submitting said fee ended on November 8, 1987. Due to a docketing error on the part of the secretary of Garth's patent attorney, the due date of said maintenance fee payment was incorrectly docketed in that attorney's system as February 6, 1990, which was three years and six months after the *re-issue* date. As a result, the attorney did not submit the first maintenance fee on behalf of Garth until January 23, 1990. That payment was rejected by the PTO on the basis that the patent had expired. The attorney filed a Petition to Reinstate the patent on March 30, 1990, asserting that the failure to pay the maintenance fee in a timely manner was "unavoidable". The PTO dismissed the petition on the grounds that the patent owner's petition had not made an adequate showing that the delay was "unavoidable". Thereafter, on October 23, 1990, the attorney filed a Petition for Reconsideration, containing additional information, as well as a later Supplemental Petition for Reconsideration. On February 22, 1991, the PTO granted the petition to reinstate the patent.

### III

Ambu contends that the PTO, by ordering the reinstatement of the patent on February 22, 1991, committed an error of law which, upon a review on a *de novo* basis, requires this Court to declare the patent in question invalid because that patent expired for non-payment of maintenance fees on November 8, 1987. Ambu argues that, as a matter of law, the PTO had no authority to declare the patent reinstated as of February 22, 1991. In direct opposition to that approach, Laerdal asserts that the PTO's reinstatement of the patent was an appropriate exercise by the PTO of its lawful authority, and that this Court should conclude that the patent was reinstated as of that date. Ambu asserts that no matter what authority the

PTO possesses, the PTO erred, as a matter of law, in concluding that the conduct in this instance can be determined to have been "unavoidable." In the view of this Court, that latter argument by Ambu factually possesses considerable merit. Although the question of whether delay was unavoidable would appear to be a question to be "decided on a case-by-case basis, taking all of the facts and circumstances into account," *Smith v. Mossinghoff,* 671 F.2d 533, 538 (D.C.Cir. 1982) (so holding in regard to "unavoidability" of delay in prosecuting a patent application within the meaning of 35 U.S.C. § 133), to the ordinary, reasonable man it would hardly appear that the patent holder's failure timely to pay the renewal fee can be said to have been "unavoidable." But that does not end the matter. Whether to permit the holder of a patent, on a late basis, to pay a renewal fee and to revive a patent constitutes a matter which is well within the normal day-to-day work assignments of the PTO. Accordingly, in terms of applying 35 U.S.C. § 41(c)(1) and determining whether or not a failure has been "unavoidable", determinations by the PTO must be accorded a large degree of discretion. In *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), Justice Stevens wrote:

When a court reviews an agency's construction of the statute it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is

---

6. Plaintiff Laerdal is the current holder of that patent. It is that patent which is involved in this case.

whether the agency's answer is based on a permissible construction of the statute. That would seem particularly true with regard to the actions of an executive agency, such as the PTO, in connection with its routine day-to-day functions, which include its performance of duties under 35 U.S.C. § 41(c)(1). As indicated in *Struthers Patent Corp. v. Nestle Co., Inc.,* 558 F.Supp. 747, 803 (D.N.J.1981) it is almost surely preferable for a reviewing court not to "involve itself in the minutiae of Patent Office proceedings and to second-guess the Patent Office on procedural issues at every turn". While the limit can be reached—or perhaps overreached—by an agency such as the PTO if it disregards the clear meaning of a congressional direction embodied in a statute, *see Smith v. Mossinghoff,* 671 F.2d 533, 538 and n. 5 (D.C.Cir. 1982); *Commissariat a L'Energie Atomique v. Watson,* 274 F.2d 594, 597 (D.C.Cir.1960); *Rydeen v. Quigg,* 748 F.Supp. 900, 904–05 (D.D.C.1990), *aff'd,* 937 F.2d 623 (Fed.Cir. 1991), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 974, 117 L.Ed.2d 138 (1992); *New South Industries v. Apache Grounding Corp.,* 666 F.Supp. 1067, 1071 (M.D.Tenn.1987); *BEC Pressure Controls Corp. v. Dwyer Instruments, Inc.,* 380 F.Supp. 1397, 1399–1400 (N.D.Ind.1974), and while it is certainly not frivolous to argue that the PTO, in the within case, did so overreach, in the final balance this Court concludes that the PTO's reinstatement of the patent in issue should not be overturned in this instance. That is so even though, in this instance, the PTO may well have stretched the meaning of "unavoidable" to the limit. *See* I Davis and Pierce, *Administrative Law Treatise,* §§ 3.2, 3.3 (3d Ed.1994).

## IV

▇ But even if this Court were not so to apply *Chevron,* the question arises as to whether or not Ambu can assert, as an affirmative defense in support of its contention that patent No. 32,219 expired on November 8, 1987, the position that the PTO erred in reinstating the patent. Pursuant to the Supreme Court's decision in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the question of when it is appropriate for the judiciary to recognize an implied cause of action rests upon the application of a four-factor inquiry. *Id.* at 78, 95 S.Ct. at 2088. Those four factors are: (1) whether the plaintiff is "one of the class for whose especial benefit the statute was enacted"; (2) whether there exists "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; (3) whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy"; and (4) whether "the cause of action [is] one traditionally relegated to state law ... so that it would be inappropriate to infer a cause of action based solely on federal law". *Id.* In this instance, the principle purpose behind 35 U.S.C. § 41(b) and (c)(1) was that Congress desired that patent holders help to finance the operation of the PTO by paying maintenance fees. Certainly that seems to preclude the conclusion, with regard to the first *Cort* factor, that Ambu, is "one of the class for whose especial benefit the statute was enacted". With regard to the second *Cort* factor, there is no indication in the statutory language or the legislative history which suggests that Congress intended to permit an alleged infringer, such as Ambu, to question an alleged error of the PTO in construing the word "unavoidable" and in applying such construction in a given instance to permit a patent holder, such as Laerdal, to revive a patent.[7] As to the third factor, that is, whether such a defense on the part of Ambu is "consistent with the underlying purposes of the legislative scheme to imply such a remedy", such a determination is at best doubtful. Although such a remedy would seemingly not destroy the legislative scheme, such remedy does clearly lie outside of that scheme. The only factor weighing in favor of Ambu's position is the fourth, for the area of patent law is not one traditionally relegated to state law. However, since three of the four factors weigh against implying such a right on the part of Ambu, and since,

---

7. The only indication of third party rights with regard to determinations made under 35 U.S.C. § 41(c)(1) is explicitly contained in § 41(c)(2), which section allows a court equitably to fashion terms to protect any investments made or business commenced by a third party after the six-month grace period expires, but before reinstatement of a patent under § 41(c)(1).

for the most part, this test has been applied cautiously against recognition of a cause of action except where the text or legislative history suggests that Congress specifically intended one [8], this Court will not imply any right on the part of Ambu in this instance. In the within context, there simply does not exist any indication that Congress intended to create a private right of action on behalf of someone in the position of Ambu; that is, that Congress intended to make available an affirmative defense in a patent infringement action of the type before this Court, so as to enable a party in the position of Ambu to escape liability for infringement of a patent by asserting that the PTO has unlawfully revived an expired patent under 35 U.S.C. § 41(c)(1). Accordingly, not only is the PTO's determination in this case reviving the patent on February 22, 1991 entitled to deference by this Court under *Chevron,* but Ambu cannot get its foot in the door without offending the principles of *Cort v. Ash.* Thus, even if this Court were to conclude that the PTO committed an error of law in the patent holder's favor, or exercised inappropriately its discretionary function under 35 U.S.C. § 41(c)(1), nevertheless such a violation by the PTO is one which Congress has apparently left to itself to remedy by way of its own legislative powers, including its appropriation authority. It is not every violation of every Congressional directive which can be utilized by a private litigant, such as Ambu, as a cause of action or as an affirmative defense. Rather, in connection with many such matters, it is up to the Congress to protect its own turf by its own dealings with the Executive, without Court and/or third-party citizen involvement. That would appear to be the situation in the within litigation with regard to the contentions of Ambu which are at issue herein.

---

**8.** Tribe, *American Constitutional Law,* § 3–23 at 160–61 and n. 37, n. 38 (2d Ed. 1988).

See also Chemerinsky, *Federal Jurisdiction,* § 6.3, p. 320 (1989) (suggesting that in *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the Supreme Court tightened its approach in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) and made it clear that a federal court should not "create a private right of action [unless] there is

## V

Ambu's motion for summary judgment with regard to Count I in this case, based upon the alleged unlawful revival of the patent, is denied, and Laerdal's motion for summary judgment with respect to that issue is hereby granted.

affirmative evidence of Congress's intent" so to do); *Ridenour v. Andrews Federal Credit Union,* 897 F.2d 715, 720 (4th Cir.1990) (Phillips, J.) (in concluding that no implied right of action exists under the Federal Credit Union Act: "(A)t least since *Touche Ross & Co. v. Redington,* it has been clear that the ultimate question [even in the light of the *Cort* factors] will always be whether Congress intended to create the asserted cause of action …").