**ALLIED TUBE AND CONDUIT CORPORATION, a Delaware corporation Plaintiff,**

v.

**JOHN MANEELY COMPANY, a Pennsylvania corporation, et al., Defendants.**

**No. CIV 99–1926–PHX–ROS.**

United States District Court, D. Arizona.

Sept. 19, 2000.

Rosemarie Christofolo, Barry Willits, Lewis & Roca LLP, Phoenix, AZ, Charles W Shifley, Marc S. Cooperman, Laura J DeMoor, Scott A. Burow, Joseph J Berghammer, Aimee M Boss, Matthew P Becker, Banner & Witcoff Ltd Chicago, IL, for Allied Tube & Conduit Corp.

Howard Ross Cabot, Brown & Bain, Phoenix, AZ, Sharon Fenick, Ronald E Karam, Rolin P Bissell, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, for John Maneely Co.

Ray Kendall Harris, Keith Lorin Hendricks, Fennemore Craig PC, Phoenix, AZ, for Razor Wire Inter., L.L.C., Perry H. Shumway, D&J Tool & Engineering, Inc., Donald W. Boness.

## ORDER

SILVER, District Judge.

On October 27, 1999, Plaintiff Allied Tube & Conduit Corporation ("Allied") filed a Complaint alleging that Defendants John Maneely Company ("Maneely"), Razor Wire International, L.L.C. ("Razor Wire"), and Perry Shumway, infringed on its patent, U.S. Patent No. 4,509,726 (" '726 Patent"), through manufacture and sale of barbed tape products. Pending before the Court is Allied's Motion for Preliminary Injunction.

### Discussion

To obtain a preliminary injunction, Allied, the moving party, must establish that: "(1) it has a reasonable likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; (3) the balance of hardships tips in its favor; and (4) an injunction would be consistent with the public interest." *Helifix Ltd. v. Blok–Lok, Ltd.*, 208 F.3d 1339, (Fed.Cir.2000). Allied has the burden of showing likelihood of success on the merits

with respect to patent validity, enforceability and infringement. *Nutrition 21 v. Thorne,* 930 F.2d 867, 869 (Fed.Cir.1991).

## I. Likelihood of Success on the Merits

■ To establish a likelihood of success on the merits, Allied must show that it will likely prove infringement of the '726 patent, and that its claim of infringement will likely withstand any challenges to the validity and enforceability of the '726 patent. *Genentech, Inc. v. Novo Nordisk A/S,* 108 F.3d 1361, 1364 (Fed.Cir.), *cert. denied,* 522 U.S. 963, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997). To satisfy the latter requirement, Allied must show that Defendant's challenges to validity and enforceability lack substantial merit. *Id.* Defendants no longer contest that, if the patent is valid and enforceable, Razor Wire's product infringes it. Therefore, the analysis of likelihood of success on the merits focuses on the challenges to validity and enforceability, and the issue of whether Defendants gained intervening rights during the period the patent lapsed.

### A. Was the Patent Valid When Issued Originally?

The '726 Patent is presumed valid. 35 U.S.C. § 282; *see also Canon Computer Systems v. Nu–Kote Intern., Inc.,* 134 F.3d 1085, 1088 (Fed.Cir.1998). However, the presumption does not relieve Allied of its burden of demonstrating likelihood of success on the merits of all disputed issues regarding validity. *Genentech, Inc.,* 108 F.3d at 1364 n. 2 (quotation omitted).

### 1. Was the Subject of the Patent Described in a Printed Publication or on Sale More Than One Year Prior to the Application Date?

An invention is not patentable if it is the subject of a printed publication, is placed in public use, or is on sale in the United States more than one year prior to the date of the application for the patent. 35 U.S.C. § 102(b).[1] The '726 patent application was filed on October 17, 1983, ('726 Patent, Pl.Ex. 1); thus, the patent is invalid if it was the subject of a printed publication or on sale prior to October 17, 1982.

■ Maneely and Razor Wire assert that the invention was the subject of a printed publication, a letter from William Boggs, then a Vice President of American (and subsequently Allied's Director of Business Development), addressed to "customers" and dated June 7, 1982. (Pl.Ex. 227). Allied argues that the letter does not constitute a publication. To satisfy the definition of "printed publication," the letter had to be generally available. *See Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 936 (Fed.Cir.), *cert. denied,* 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 250 (1990). The keys to this determination are whether the letter was disseminated and accessible to the public interested in the invention. *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1568 (Fed.Cir.1988). Boggs testified that he sent the letter to distributors, along with a price list, and that both were stamped "confidential." (Pl.Ex. 227; Boggs Test., Tr. at 247). The parties do not dispute that the letter went to 20–30 of these distributors. Because the letter was sent to distributors, rather than end users to whom the distributors sold, and was marked confidential, the letter was not accessible to the interested public and does not constitute a publication.

■ In a memorandum prior to the hearing, Razor Wire asserted that the '726 patent is not valid because the barbed tape that is the subject of the patent was "on sale" prior to October 17, 1982. 35 U.S.C. § 102(b). In determining whether the patented tape was "on sale" pursuant to § 102(b), the first issue is whether the

---

1. Section 102 states in pertinent part: "A person shall be entitled to a patent unless ... (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States".

barbed tape sold prior to the relevant date contained each element of the claims of the '726 Patent, "and thus was an embodiment of the claimed invention." *Scaltech Inc. v. Retec/Tetra, L.L.C.,* 178 F.3d 1378, 1383 (Fed.Cir.1999). In addition, the barbed tape had to be the subject of a commercial offer for sale and had to be ready for patenting. *Id.* (citing *Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 65, 119 S.Ct. 304, 311, 142 L.Ed.2d 261 (1998)). Allied argues that it did not have barbed tape on sale containing all three elements of the '726 patent claim: a reinforcing wire, a flange, and a narrowing of the flange at the barb roots, prior to October 17, 1982. ('726 Patent, Claim 1).

In its post-hearing memorandum and its proposed findings of fact and conclusions of law, Razor Wire did not restate the defense that American offered the patented tape for sale before October 17, 1982; rather, it argued only that the patented tape was produced prior to that date. (Razor Wire's PFFCL ("RWPFFCL") at FF ¶ 43 and CL ¶ 14). Thus, it is unclear whether Razor Wire means to continue to assert the "on sale" defense. Because Razor Wire raised the issue of the "on sale" date prior to the hearing and the parties offered evidence pertaining to the issue at the hearing, the Court will address the on-sale defense.

Advertisements suggest that American did not sell barbed tape with all three of the patented features listed above prior to October 17, 1982. Plaintiff offered as evidence American's advertisements in *Fence Industry* magazine from January, 1981 through December, 1983. (Pl.Ex. 189(a)-(ii)). In five monthly issues, from July, 1982 through November, 1982, a small sentence in the ad states: "Ask about our new, improved RAZOR RIBBON." (Pl. Ex. 189(s)-(w)). However, nothing else is stated about the product and thus it is not clear whether the ad is referencing the patented product. Boggs testified at the

hearing that the product referenced is the grooved tape, not the wire-reinforced tape. (Tr. at 375). Moreover, American began to sell large quantities of the grooved tape beginning around that same time, in June, 1982. A new product is not mentioned at all in the December, 1982 and January, 1983 issues, and the February, 1983 issue is not in the record. (Pl.Ex. 189(x)-(y)).

The first advertisement describing Razor Ribbon II, the patented tape, appeared in the March, 1983 issue. (Pl.Ex. 189(z); (Tr. 375)). The ad states, in relevant part:

Now it's even better! Razor Ribbon barbed tape is roll-formed and cold clenched over a high tensile steel wire. It can't be cut like the other barbed tape obstacles and defies even the most determined intruder.

New Razor Ribbon II shows just how serious you are about your security.

For full assistance on all your security fencing needs, call us now!

(Pl.Ex. 189(z)). An advertisement with a more detailed picture of the product appeared in the April, 1983 issue. (Pl.Ex. 189(aa)).

Although the earlier ads instructed customers to ask about a new product as early as July, 1982, the ads did not provide details about the patented product until March, 1983, or possibly February 1983, in the issue not offered into evidence. (Tr. 372–75). Boggs testified that American wanted to advertise its new products, such as its patented barbed tape, as soon as it could. (Tr. 376). He admitted that artwork had to be submitted to *Fence Industry* magazine in advance. (Tr. 376). However, even with the advance time for ad submission, the dates of the magazine ads suggest that American did not begin selling its patented barbed tape until early 1983. Had American begun selling the patented tape sooner, it could have submitted artwork to the magazine even earlier.[2]

2. In its post-hearing pleadings, Plaintiff argues that the 1983 issue of "Sweets Catalog,"

containing building products, includes American's security fences but does not show a

Moreover, Boggs testified at the hearing that the earliest American sold the patented barbed tape product was November 1982. (Tr. 249, 254, 257).

American's records of orders also suggest that American did not sell the patented tape prior to October 17, 1982. American's chronological order files for 1982, (Pl.Ex. 190–201), contain orders for both flat, grooved, and wire-reinforced product. The first orders referencing a sale of Razor Ribbon with wire, one of the elements of the '726 patent claim, are dated November, 1982. (Pl.Ex. 200, docs.A132239, 43, 44).

The parties dispute the date that American was able to begin manufacturing the patented barbed tape. However, even if the product was manufactured before October 17, 1982, the on-sale defense, as stated above, requires that the barbed tape be the subject of a commercial offer for sale. *Scaltech Inc.*, 178 F.3d at 1383 (citing *Pfaff*, 119 S.Ct. at 311). Absent evidence that the product was offered for sale prior to October, 1982, the date of manufacture does not establish the defense.

The evidence indicates that American did not sell the patented barbed tape prior to November 1982. Therefore, Defendants' argument, that the patent is invalid because American sold the patented tape more than one year prior to filing the patent application, lacks "substantial merit." *Genentech*, 108 F.3d at 1364. Plaintiff has made the necessary showing of a likelihood of success on the merits of this issue. *Id.*

Maneely asserts the on-sale defense on a different ground. According to Maneely, another corporation, Man Barrier, began

selling a product containing the three essential elements of the patent claim prior to October 17, 1982. Maneely offers the 1989 deposition of Dr. Arthur Stanley, who became Director of Operations at Man Barrier Corporation in about 1977 after managing the United States Army's controllable barrier systems analysis program.[3] (Stanley Dep. 27, 31–32, 39–40). Stanley testified that Man Barrier was selling wire-reinforced short barbed tape at least as of August 17, 1981. (*Id.* 70–71). However, this product did not have a flange, one of the elements of the patented claim. (*Id.* at 132). During the 1980 to 1982 time frame, Man Barrier also manufactured a long barbed tape product clinched around a line wire. (*Id.* 121, 130–32). This is apparently the product Maneely claims to have been "on sale" more than one year prior to October 17, 1982. However, Stanley's testimony does not indicate that this product had all the elements set forth in the patented product claim. (*See id.* at 130–132).

In addition, Allied argues that Stanley's deposition is inconsistent with the hearing testimony of Robert Major, an employee of Man Barrier from 1977 to 1985, and of American from 1985 to 1997. (Tr. 692–93). At Man Barrier, Major initially worked as a plant engineer and became involved in product development and manufacturing. (Tr. 693–94). Major testified that Man Barrier first produced a product similar to American's patented tape in 1983. (Tr. 724). In a 1989 deposition, Major also testified that Man Barrier produced a similar product early in 1993. (Major Dep., May, 1989, at 64).

barbed tape product with all the patented features. Although the catalog does not refer to "Razor Ribbon II," the name ultimately given the product, it does show a picture of a barbed tape with a reinforcing wire. (Pl.Ex. 211). It is not clear whether or not this product contains all of the features in the '726 patent claim. However, a product appearing in the 1983 Sweet's catalog would not establish sales in 1982.

3. When Dr. Stanley's deposition was taken in 1989, he was employed by Rockwell International as a theoretical physicist, and had been out of the barbed tape business since his departure from Man Barrier Corporation in 1985 or 1986. (Stanley DT. 39–40, 49, 178–79).

The parties have presented conflicting testimony about the date on which Man Barrier began to sell a barbed tape with the elements listed in the patented tape claim. However, Dr. Stanley's testimony was offered only by deposition, precluding full assessment of his credibility. Even if Stanley's testimony were credited rather than Major's, the evidence does not indicate that Man Barrier's barbed tape contained all three of the necessary elements. Plaintiff has shown a likelihood of success on the merits by showing that Defendants' argument lacks "substantial merit," *Genentech*, 108 F.3d at 1364.

### 2. Was the Patent Obvious?

Defendants argue that the '726 patent is not valid because the barbed tape already on the market rendered the patented barbed tape obvious. An invention is not patentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). Due to the presumption of validity, a patented invention is presumed nonobvious. *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1480 (Fed.Cir. 1998). In determining whether it is obvious, the invention is considered as a whole and the patent claims are considered in their entirety. *Id.* The Federal Circuit explains:

> Measuring a claimed invention against the standard established by section 103 requires the oft-difficult but critical step of casting the mind back to the time of invention, to consider the thinking of one of ordinary skill in the art, guided only by the prior art references and the then-accepted wisdom in the field.

*Ecolochem, Inc. v. Southern Cal. Edison Co.*, 227 F.3d 1361 (Fed.Cir.2000) (citing

*In re Dembiczak*, 175 F.3d 994, 999 (Fed. Cir.1999)).

Maneely and Razor Wire argue that the patented barbed tape was obvious in light of a sample barbed tape Boggs sent to Major Carl, the Commandant of the U.S. Army Engineering School at Fort Belvoir, Virginia. On October 22, 1981, Boggs wrote to Major Carl to inform him that American had produced a barbed tape that clinched long barbed tape onto a hard core wire. (Ex. 709). Boggs enclosed samples of the new long-barb wire-reinforced product with the letter. Maneely and Razor Wire acknowledge that the samples sent to Major Carl differed from the patented barbed tape to the extent that they did not contain flanges that narrowed at the barb roots. However, both Defendants argue that the cutouts narrowing the flanges were well-known in the prior art. Allied strongly disputes this assertion, and argues that no prior art contained flanges narrowing at the barb roots.

Defendants argue that the prior art rendering the patented material obvious includes American's grooved razor tapes with cut-outs narrowing the flanges at the barb root. The parties do not dispute that American could not create the tape with a narrowed flange until it received a "5–up die" from the person who designed and produced it, Donald Boness.[4] The machine is referred to as "5–up" because it is designed to punch five strands of metal barbed tape from a single metal tape blank. (*See* 1986 Boness aff. at ¶ 4, Pl.Ex. 152). In December 1980, after meeting with employees of American, Boness drew a plan for a 5–up die that would punch barbed tape with strands narrowing at the barb roots. (*Id.* at ¶ 5; 5–Up Die Plan, Ex. 202). In 1981, Boness ordered a blueprint for a rollformer from L & A Enterprises. (Tr. at 632–33). The blue print depicts the barbed tape produced by the five-up die, and shows the flange narrow-

4. Boness testified that single dies could not produce a tape with a flange narrowed at the barb root. (Tr. 246).

ing at the barb roots. (Tr. 635; Blueprint, Ex. 561).

When the first 5–up die was produced and delivered to Allied is largely a credibility determination. Allied argues that the 5–up die was not used in production until November, 1982. In affidavits dated June, 1986, Boggs and David VanDenburgh, American's president, both swore that American sent Boness a formal purchase order for its first 5–up die in July 1982, and Boness' first 5–up die was delivered to American in November 1982. (Exs. 245 ¶ 15, 16; 88, p. 118, ¶ 15). Boggs also testified at the hearing that he thought Boness delivered the first 5–up die in November or December 1982. (Tr. 249, 252).

Documents confirm that Boness delivered a five-up die to American in November, 1982. The earliest purchase order for a 5–up die contained in the record, No. 4230, dated July, 7, 1982, states that the 5–up die is "[r]equired to be operational by November 22, 1982." (Ex. 219). A packing slip reflects that this 5–up die was completed and shipped on November 2, 1982. (*Id.*) The invoice corresponding to the order is dated November 4, 1982. (*Id.*) Boggs testified that this purchase order, the packing slip and the invoice all concern American's first 5–up die. (Tr. 249–253). In addition, Boness' wife maintained a log of his sales, service, and repair work. (Tr. 507). The purchase order, invoice, and packing slip contain an order number, order date, due date, and delivery date that correspond to the dates set forth in entry number 839 in Boness' work log. (Ex. 155).

Boness' wife began the work log in February, 1982. (Tr. 507). The log contains a few entries dated prior to February, 1982, from June, 1981 through January, 1982. (Ex. 155). Boness testified that entries with dates prior to February, 1982 reflect

orders that were still pending in February, transferred from an older log that is no longer available. (Tr. 507). The earlier entries note completion or "out" dates of February, 1982 or later.[5] (*Id.*) The log indicates that three five-up dies were delivered to American in 1982 and 1983, in Boness' log at entry numbers 839, 975, and 1020. (Ex. 155). However, Defendants argue that Boness delivered his first 5–up die to American in 1981, prior to the date on which his wife started keeping the log.

Boness testified at the hearing that his wife incorrectly recorded in the log the order and delivery dates of the five-up die. (Tr. 573). However, that statement is inconsistent with the dates in surrounding entries in the log, as well as the dates on the invoice and packing slip. Defendants argue that Boness' subsequent log entries support the conclusion that a total of five 5–up dies were delivered. Boness' log contains approximately thirty entries for service and repair on American's five-up dies for over three years without identifying the particular die serviced. (*Id.*) However, beginning on April 21, 1986, all of Boness' subsequent entries for American's five-up dies, approximately twenty-nine total by the end of January, 1990, contain a number for the 5–up die that was serviced or repaired, a number between one and five. (*Id.*) These numbers in the log suggest that Boness was servicing a total of five 5–up dies for American in April, 1986 and thereafter.

Defendants refer to other entries in the log as additional support for the position that Boness shipped American at least one five-up die prior to the die logged at entry number 839 and delivered in November, 1982. According to Defendants, the log shows that, on December 16, 1982, American sent two five-up dies to be sharpened.[6]

---

5. Two January, 1982 "out" dates are included, but only for entries containing multiple dates. The second "out" date in each of these entries is March, 1982.

6. A log entry on November 16, 1982, states "update 2 dies-add bending arm." (Ex. 155, No. 917). Maneely asserts this entry also supports the conclusion that American had two five-up dies by this time. However, the

(Ex. 155, No. 932; Tr. 596). If the die delivered in November 1982 were the first, American could not have sent two for sharpening in December, because the next die was not ordered until March, 1983 and delivered in May, 1983. (*Id.*, No. 975). However, at the hearing, Boness acknowledged that the entry may have indicated that a die was sharpened, returned to American, and then sent back to Boness' shop for more work. (Tr. 595).

Defendants also point out that the log indicates that Boness was servicing five-up dies for American well before the delivery in November 1982 of the die that Allied claims to be the first. (Ex. 155, Entry Nos. 774, 822, 828, 856, & 892). Allied argues that these early entries do not reflect that American was using 5-up dies in production before November, 1982. Boness testified at the hearing that the frequency of sharpening a die used in production varies depending on factors such as the speed of the press. (Tr. at 585). However, he acknowledges that, in a prior deposition, he had testified that dies require sharpening at a frequency ranging from two to six weeks. (Tr. 586). He further testified that sharpening took at least three to four days when he first began selling 5-up dies to American. (Tr. 589). It definitely could not be performed in one day. (*Id.*) The first four entries in the log noting sharpening of a 5-up die indicate that the die arrived at Boness' facility and was shipped back out on the same day. (Ex. 155, Entry Nos. 774, 822, 828, and 856). Due to the short turnaround time, Boness testified that these early entries had to reflect something other than sharpening of dies. (Tr. 590).

Boness considered it likely that, rather than sharpening the dies on these occasions, his shop performed some type of repair work instead. *Id.* He added that a charge of $390 set forth in one of the early entries for sharpening also suggests that different work was performed, because sharpening was considerably more expen-

sive. (*Id.* at 391). It was not until December 16, 1982, in the log entry reflecting two incidents of sharpening, that the die or dies were kept longer than one day. (Ex. 155, Entry No. 932). One delivery date was 3 weeks after shipment, on January 7, 1983, and the second was on January 12, 1982. This evidence suggests that American first began running production through Boness' 5-up die in approximately mid-November, 1982. (*Id.*; Tr. 586–587).

Both Allied and Defendants attempt to rely on various statements by Boness to support their respective positions about the date American began using a 5-up die. Therefore, it is not surprising to find that Boness' testimony about the first delivery date is inconsistent. Boness testified at the hearing that he delivered a total of five 5-up dies to American, and that the die delivered in November, 1992 was the third. (Tr. 641). At one point in the hearing, Boness testified that he delivered the first two dies in 1981, but at another point, he testified that he could not remember when these first two dies were shipped. (Tr. 513, 641).

Another Boness deposition also reflects his uncertainty about delivery dates. During his 1989 deposition in the *Coastal Wire Warehouses,* ("*Coastal*"), litigation, Boness testified that he could not say that the die delivered in November 1982 was the first five-up die, and that it could have been the second or third such die he delivered to American. (Boness Dep., Sept. 12, 1989, 5–9, 13). However, in his 1986 affidavit submitted to the Patent and Trademark Office, ("PTO"), the statement closest in time to the events at issue, Boness averred that the first 5-up die was delivered in November, 1982. (Ex. 152 ¶ 7). Given both the lack of certainty expressed in some of these statements and the inconsistency among other statements, the Court does not consider Boness' testimony about delivery dates to be credible.

entry does not state whether both dies were 5-up dies.

Defendants offer other witnesses in support of the argument that the five-up dies were in operation well before November, 1982. Renne Cano, a Defendant and former employee of American, testified that American obtained its first 5–up die in 1981. (Tr. 446). However, Cano acknowledged that, in a deposition for the *Coastal* litigation, he testified that he thought American received its first 5–up die in 1982 or 1983 (*Id.* at 410). Cano further testified that American ultimately obtained five of these dies, and that each was stamped with a number from one to five. (*Id.*) Defendants also offer the April, 2000 testimony of Cruz Cabrera, another former American employee. This testimony is inconclusive because he merely stated that American obtained the first dies in either 1981 or 1982. (Cabrera Dep. at 16). However, Manuel Perez, a former American employee currently employed by Cano at Razor Wire, testified that American was using a 5–up die to make grooved razor tape when he went to work for the company in August, 1982. (Tr. 763).

The witness testimony about the time at which American began making the grooved product with the five-up die is inconsistent and a number of the witnesses expressed some degree of uncertainty. Boness' contemporaneous work log shows work on a five-up die on four occasions before the November, 1982 ship date of the five-up die Allied claims was the first. However, given Boness' admission that the description of the work performed on these occasions, sharpening, was inaccurate, the description of the product, a 5–up die, may have been inaccurate as well. The Court finds VanDenburgh's testimony credible and concludes that American likely ordered its first five-up die in August, 1982 for delivery in November, 1982.

Defendants also point to the timing of American's increase in grooved razor wire sales, beginning in June, 1982, to support the position that the 5–up die was in operation before November. American's records indicate that the company obtained orders for 20 boxes of the grooved razor wire in January, 1982. (Ex. 190, doc. A131528). On March 19 and April 9, 1982, American received two more orders for a total of 18 more boxes. (Ex. 192(a), 193(a)). However, in June and July, American began marketing the grooved product. In the June, 1982 letter to distributors discussed previously, Boggs discussed the grooved razor tape. (Ex. 227). The letter described the "new improved 'grooved' RAZOR RIBBON," and explained that the grooved ribbon would eventually have a wire impressed in the center, encompassed by the groove. (*Id.*) Likewise, the ads for "new, improved Razor Ribbon," beginning in the July, 1982 *Fence Industry* magazine, were an indirect reference to the grooved product. (Boggs Dep., March, 2000, at 347). Beginning in July 1982, American received hundreds of orders for the grooved product and shipped thousands of rolls. (Exs.196(a)–201(a)).

Allied does not dispute that American sold grooved razor tape several months before it began manufacturing the wire-reinforced tape. However, Allied argues that the grooved tape did not render the wire-reinforced tape obvious because, at the time of invention of the latter, the grooved tape did not have cut-outs narrowing the flanges. As stated above, the parties do not dispute that American could not create tape with narrowed flanges until it received a 5–up die. The increase in sales volume does not necessarily indicate that American was using the 5–up dies in July.

As stated above, Perez testified that American was making grooved razor tape with a 5–up die when he went to work for the company in August, 1982. (Tr. 763). However, other testimony is more ambiguous. Gabriel Valdez, an employee of American who has worked for the company for over 20 years, in manufacturing and as a troubleshooter servicing machines, testified in his deposition that the company made the grooved razor tape with a 5–up die. (Valdez Dep., March, 2000, at 80).

Valdez also testified that, when American produced the grooved tape with the 5–up die, it had longer barbs and cutouts. (*Id.* 107). However, Valdez' testimony does not indicate whether American started by making the tape on another die, or always made it on the 5–up die. (Ex. 1033 ¶ 4).

Cano testified that the grooved tape always had cut-outs narrowing the flanges. (Tr. 443). Lewis, another former American employee, testified that the grooved tape and the wire-reinforced tape were identical, except for the wire. (Tr. 835). However, Lewis returned to American in 1983 after several years away from the company. (Tr. 830). Therefore, he did not have personal knowledge of the machine used to make the grooved tape in 1982, or knowledge of whether the grooved tape always contained cut-outs narrowing the flanges.

VanDenburgh, American's president, testified that American probably made some of the grooved product on a 1–up die without a cut-out when it started up the roll former. (Tr. at 524). Boggs, the former vice-president, also testified that American started making the grooved tape with a single-up die to see if they could put the barbs through a roll former. (Tr. 245). He added that the product made with the one-up die did not have a narrowing of the flange. (*Id.* 246).

The Court finds VanDenburgh's testimony particularly credible and concludes that the grooved tape product began to be manufactured before the 5–up die was available in November, 1982. Because the grooved tape produced prior to use of the 5–up die did not contain a narrowing of the flange at the barb root, the grooved tape product did not help render the patented product obvious prior to the date of invention.

■ Razor Wire argues that other products on the market rendered the patented tape obvious. Razor Wire argues that Man Barrier made wire-reinforced barbed tape prior to October, 1982, with a cutout at the root of the barb. Razor Wire offers testimony of Major about Man Barrier's products, but, as discussed above, Major does not testify that the other products had each of the elements stated in the patented tape claim. (Tr. 757). However, Steve Garner testified that a Bataco product with a wire and a cutaway narrowing the flange existed on the market before Garner even entered the business in 1975. (Tr. 832–33). Garner referenced exhibits 137 and 138. The first is a flat barbed tape, and the second is a wire-reinforced tape. Both have cut-outs. However, Major testified that these products do not have flanges. (Tr. 744–745).

Moreover, as Allied asserts, one of the two patents for inventions by Siegfried Uhl referenced in the '726 patent, patent number 2,908,484 for a barbed wire spiral, pertains to a "Bataco-style" barbed tape similar to exhibit 187. (Ex. 167 ('484 Patent)). Allied asserts that it disclosed this patent, and another Uhl patent, number 3,916,958, to the PTO, and the Court notes that both patents are discussed in the '726 patent. (Ex. 1). The presumption of validity includes the presumption that the patent examiner considered the references that were before him or her. *Al–Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed.Cir.1999); *see also In re Portola Packaging, Inc.*, 110 F.3d 786, 790 (Fed. Cir.1997). Therefore, the burden of overcoming the presumption is more difficult when the prior art was before the examiner. *Al–Site Corp.*, 174 F.3d at 1323. Given the fact that a Bataco-style product was before the examiner, combined with Major's testimony that the product does not contain a flange, the Court concludes that the Bataco-style products did not render the patented tape obvious.

The other patent to which Razor Wire refers, number 3,363,455, pertaining to a barbed tape invented by Meckel, likewise was disclosed to the patent examiner and listed in the '726 patent. (Ex. 1). Moreover, this product does not have a narrowing of the flange at the barb root. (Ex.

170). The Meckel patent does not render Allied's patented tape obvious.

Plaintiff has shown a likelihood of success on the merits by showing that Defendants' arguments about obviousness lack "substantial merit," *Genentech*, 108 F.3d at 1364.

### 3. Does the Doctrine of Judicial Estoppel Bar Allied From Asserting that the Patent is Valid?

■ Maneely argues that the doctrine of judicial estoppel bars Allied from asserting that its patent is valid, because its subsidiary, Coastal, made assertions to the contrary in previous litigation. In that litigation, commenced in 1988, American alleged that Coastal infringed the '726 patent. (Ex. 270). The doctrine of judicial estoppel is invoked to prevent a party from abusing the judicial process by asserting a position inconsistent with a position the party previously asserted, whether in the same or in different litigation. *See Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 600, 605 (9th Cir.1996); *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990) *cert. denied*, 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991). The doctrine is most commonly employed to prevent parties from making contradictory factual assertions. *Id.* at 1037 (internal quotation omitted).

Judicial estoppel exists to preserve the dignity and integrity of the judicial process by preventing a litigant from "playing fast and loose with the courts." *Rissetto*, 94 F.3d at 601 (internal quotation omitted). Given the importance of the goals underlying the doctrine of judicial estoppel, the Ninth Circuit has even applied the doctrine to a civil litigant who had taken an inconsistent position in a prior administrative proceeding regarding worker's compensation. *Id.* at 604.

In the prior *Coastal* litigation, Allied's wholly owned subsidiary, Coastal, argued that American was not entitled to the attorney-client privilege or the work product privilege due to its conduct. In support of this argument, Coastal asserted:

Concealment was key to American's success in the Patent Office [in obtaining the '726 patent] because—

1. American withheld from the Patent Examiner the fact that it had offered to sell wire reinforced long barbed tape to the Army that had all of the elements of its initially filed broadest claim.

2. American concealed the product of a competitor, Bataco, which included the "undercut" feature, which the Patent Office believed important to the issuance of the patent.

3. American concealed a German patent . . . which, coupled with ordinary skill would have taught the Examiner that the undercut was old.

4. American concealed from the Patent Office a sales publication of its product, published more than one year before the patent application, informing its customer that the wire reinforced tape it had offered to the Army would be available to them.

("Defendant's Brief in Support of its Motion . . . to Compel Production of Documents" in *American Fence Co., Inc. v. Coastal Wire Warehouses, Inc.*, CIV 88–0614 PHX CLH, Ex. 806 at 4). At least three of these arguments, numbers 1, 2, and 4, are related to arguments Allied is now trying to refute in the action at bar. Number one is a reference to Boggs' letter to Major Carl, number two is a reference to the Bataco product, and number four is a reference to Boggs' 1982 letter to distributors. Defendants do not accuse Allied of concealing the letter to Carl, the Bataco product, or the sales letter; however, Defendants argue that all of these materials help render the patented product obvious. The brief filed by *Coastal* continues with a section addressing each of the arguments numbered above. (Ex. 806). With respect to the first argument, about the sample sent to Major Carl, Coastal's brief states:

Against this overwhelming evidence [that the sample sent to Carl matched a

drawing located in Americans ad agency's files], Boggs now says he won't dispute Major Carl's testimony.

This is quite a change for Boggs. In 1985 in another lawsuit before this Court involving the same patent, Boggs misidentified the product he sent to Major Carl. In May 1989, when Coastal first deposed him in this litigation, Boggs engaged in the same mischaracterization of the product he sent to the Army.

.... In this lawsuit Boggs not only mischaracterized what he sent to the Army in his first deposition, he provided incorrect and misleading answers to interrogatories. When asked when American first manufactured wire reinforced long barbed tape, Boggs answered, "First ppototypes [sic] manufactured in late summer or early fall 1982." That was not true. When confronted with test reports of tests that Boggs requested, Boggs backpedaled and admitted that American requested outside testing of its wire reinforced product at least as early as January 1982—a time in close proximity to Boggs' letter to the Army.

(*Id.* at 7–8 (citations omitted)). Boggs, the very witness Coastal repeatedly accuses, during the *Coastal* litigation, of past "mischaracterization," is now one of Allied's material witnesses in the action at bar. How Allied expects the Court to consider Boggs' testimony credible in light of its own past accusations is very puzzling.

In another pleading in the *Coastal* litigation, Defendant's Motion for Extension of Time for Completion of Pre–Trial Procedures, Allied, through Coastal, continues to make arguments it is now attempting to refute in the action at bar. (Ex. 783). Allied, through Coastal, states:

Defendant believes that plaintiff's patent is invalid not only because the subject matter is obvious (35 U.S.C. § 103), but also [because] plaintiff sold or offered the subject matter of the patent for sale more than one year prior to the application therefor. (35 U.S.C. § 102(b)).....

In addition to the above evidence directed to the invalidity of plaintiff's patent, defendant believes that it will show that the subject matter of plaintiff's patent was obvious because of the activities of plaintiff's competitors, including Man Barrier in Connecticut.

(*Id.* at 4–5).

Allied argues that the doctrine of judicial estoppel is inapplicable because the court in the *Coastal* litigation never concluded that the '726 patent was invalid. On numerous occasions, the Ninth Circuit has indicated that other circuits set forth two differing approaches in determining when to apply the judicial estoppel bar. *See, e.g., Rissetto,* 94 F.3d at 601 (quoting *Yanez,* 989 F.2d at 326) (internal quotation omitted); *Garcia,* 37 F.3d at 1367 (quoting *Britton v. Co-op Banking Group,* 4 F.3d 742, 744 (9th Cir.1993)) (additional internal quotation omitted). Of the circuit courts that have reached the issue, the majority apply the bar only when the court hearing the previous action adopted, in some manner, the inconsistent statement presented during that action. *Rissetto,* 94 F.3d at 601 (quotation omitted); *Garcia,* 37 F.3d at 1367 (quotation omitted). The minority apply the bar even when the litigant was unsuccessful in asserting the inconsistent statement during previous proceedings, if the litigant is playing "fast and loose" with the courts by changing his or her position. *Rissetto,* 94 F.3d at 601 (quotation omitted); *Morris v. California,* 966 F.2d 448, 453 (9th Cir.), *cert. denied,* 506 U.S. 831, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992).

The Ninth Circuit had never found it necessary to choose between these two approaches; rather it continually applied both approaches and arrived at the same result. *See, e.g., Britton,* 4 F.3d at 744; *Yanez,* 989 F.2d at 326; *Morris,* 966 F.2d at 453. In *Rissetto,* 94 F.3d at 601 n. 3, the Ninth Circuit further observed that most of the other circuit courts do not utilize solely one approach or the other.

Most of the other circuit courts have concluded that judicial estoppel is particularly appropriate when a party succeeded in prior proceedings by asserting an inconsistent position; however, they have not concluded that the doctrine applies only in that context. *Id.* (citing *AFN, Inc. v. Schlott, Inc.*, 798 F.Supp. 219, 224–25 n. 7 (D.N.J.1992)). *Accord,* Lawrence B. Solum, *Moore's Federal Practice* § 134.33[4] (3d ed.1998). However, in a subsequent decision the Ninth Circuit declined, without discussing the existence of two positions, to apply judicial estoppel as a bar because the court in the prior action had not adopted the inconsistent position. *Masayesva for and on Behalf of Hopi Indian Tribe v. Hale*, 118 F.3d 1371, 1382 (9th Cir.1997), *cert. denied sub nom., Hale v. Secakuku*, 522 U.S. 1114, 118 S.Ct. 1048, 140 L.Ed.2d 112 (U.S.1998). Hence, the Ninth Circuit embraced the majority view.

Defendants have not offered evidence that the court in the *Coastal* litigation adopted the factual assertions of Allied's subsidiary, Coastal, or reached the conclusion that the '726 patent was invalid. Therefore, judicial estoppel will not be applied as a bar. *Masayesva for and on Behalf of Hopi Indian Tribe*, 118 F.3d at 1382.

### B. Did the PTO Properly Reinstate the Patent?

■ When American Fence Company, Inc, a subsidiary of American, owned the '726 patent, a maintenance fee for the patent became due to the PTO on October 9, 1996. However, Defendants admit that Defendant Perry Shumway instructed patent counsel to refrain from paying the fee. (Note by Cahill, Sutton & Thomas, attached as ex. to Petition to Accept Delayed Payment, Ex. 893); *see also* (Ex. B. to Maneely Co. Resp. to PI Mot., Ex. G to Pl. Reply.) Because the fee was unpaid, the patent lapsed on April 9, 1997 following the expiration of a six-month grace period.

On February 4, 1997, prior to the time the six-month grace period expired, Allied entered into a stock purchase agreement ("SPA") to purchase all the outstanding capital stock of American. (Ex. 522). The SPA expressly provided that the stock of subsidiary American Fence Company, Inc., ("AFCI"), was an asset excluded from purchase. (*Id.* 1). Defendants argue that Plaintiff did not purchase the assets of AFCI, including the '726 patent. However, Allied asserts that the SPA conferred ownership of the '726 patent. Allied points to the list of excluded assets attached as schedule 5.9.2 to the SPA, a list that does not contain the '726 patent. (*Id.* at sched. 5.92). Allied also points to the Supply Agreement, attached to the SPA as schedule 5.8, in which it agreed to sell the products listed in exhibit A (attached thereto) to American Fence and Security Company, Inc. and its affiliates, including AFCI. (*Id.* at sched. 5.92). The list of products in Exhibit A includes the Razor Ribbon barbed tape. (Ex. 249). Finally, Allied relies on schedule 3.1.14, listing the Intellectual Property Rights it acquired via the SPA, and points out that it acquired the Razor Ribbon trademark. (Ex. 522 at sched. 5.92).

Regardless of whether the SPA initially transferred the '726 patent, Allied obtained an "Assignment Nunc Pro Tunc" on April 9, 1999, transferring ownership of the '726 patent from AFCI to Allied, effective *nunc pro tunc* as of February 4, 1997. (Ex. 251). On the same day the assignment was given, April 9, 1999, it was file-stamped as received by the PTO. Along with the Assignment, Plaintiffs filed a petition requesting that the PTO accept late payment of the maintenance fees for the '726 Patent. (Ex.). The April 9, 1999 date was the final date of the 24–month period following the lapse of the patent in which the PTO could accept payment of the maintenance fee upon a showing that failure to pay the fee was "unintentional". 35 U.S.C. § 41(c)(1).[7] Plaintiff informed

7. 35 U.S.C. § 41(c)(1) provides, in full:

The Commissioner may accept the payment

the PTO that it was not aware of the decision to allow the '726 patent to lapse. Ultimately, the PTO agreed to reinstate the '726 Patent effective October 26, 1999.

Defendants argue that the PTO erred in permitting reinstatement of the patent. In its Reply to Defendants' proposed findings and conclusion, Allied argues for the first time that the statute governing reinstatement does not create an implied defense of erroneous reinstatement. Therefore, the Court has not obtained the benefit of full briefing on this issue. Only two courts have addressed the issue, and both conclude that defendants in an infringement action generally cannot assert erroneous reinstatement as an affirmative defense. *See California Med. Products, Inc. v. Tecnol Med. Products, Inc.*, 921 F.Supp. 1219, 1256–57 (D.Del. 1995); *Laerdal Med. Corp. v. Ambu, Inc.*, 877 F.Supp. 255, 259–60 (D.Md.1995). As the Delaware district court explains, the Patent Act delineates the defenses that may be offered in an action challenging patent validity or infringement. They are:

(1) Noninfringement, absence of liability for infringement or unenforceability,

(2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability,

(3) Invalidity of the patent or any claim in suit for failure to comply with any requirement of sections 112 or 251 of this title,

(4) Any other fact or act made a defense by this title.

35 U.S.C. § 282 (quoted in *California Med. Products, Inc.*, 921 F.Supp. at 1256). The Delaware court noted that the defense of erroneous reinstatement is not one of the defenses described in paragraph one,

noninfringement, absence of liability for infringement, or "unenforceability," a term covering equitable defenses including "latches, estoppel, unclean hands, and inequitable conduct." *California Med. Products, Inc.*, 921 F.Supp. at 1256 (citing *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1561 (Fed.Cir.1984)). However, the Delaware court added that it "expresse[d] no opinion as to whether misrepresentations made by a patent holder in a reinstatement petition under section 41(c) could constitute inequitable conduct." *Id.* at 1256 n. 30. This Court will return to this point after considering the other three defenses listed in § 282.

As the Delaware court explained, the defense of erroneous reinstatement does not fall under paragraph two either, because the reinstatement provision, 35 U.S.C. § 41 appears in part I of title 35, not part II. *California Med. Products, Inc.*, 921 F.Supp. at 1256. Likewise, § 41 is not one of the specific sections set forth in paragraph three. *Id.* Absent inequitable conduct that might cause the defense to fit within paragraph one, then, the only possible paragraph that could encompass an erroneous reinstatement defense is the catch-all provision of paragraph four, providing for " '[a]ny other fact or act made a defense by this title.' " *Id.* (quoting 35 U.S.C. § 282(4)).

Because § 41 does not expressly make erroneous reinstatement a defense, the Delaware court considered whether the affirmative defense could be implied, based on the four-part inquiry used to determine whether a statute gives rise to an implied right of action. *Id.* at 1257 (citing *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)). The Delaware district court adopted the Maryland court's application

of any maintenance fee required by subsection (b) of this section which is made within twenty-four months after the six-month grace period if the delay is shown to the satisfaction of the Commissioner to have been unintentional, or at any time after the six-month grace period if the delay is

shown to the satisfaction of the Commissioner to have been unavoidable.... If the Commissioner accepts payment of a maintenance fee after the six-month grace period, the patent shall be considered as not having expired at the end of the grace period.

of the *Cort* factors to section 41. *California Med. Products, Inc.*, 921 F.Supp. at 1257. The Maryland court stated, in relevant part:

[T]he principle purpose behind 35 U.S.C. § 41(b) and (c)(1) was that Congress desired that patent holders help to finance the operation of the PTO by paying maintenance fees. Certainly that seems to preclude the conclusion, with regard to the first *Cort* factor, that [defendant], is "one of the class for whose especial benefit the statute was enacted". With regard to the second *Cort* factor, there is no indication in the statutory language or the legislative history which suggests that Congress intended to permit an alleged infringer ... to question an alleged error of the PTO in construing the word "unavoidable" [or the word "unintentional"] and in applying such construction in a given instance to permit a patent holder ... to revive a patent. As to the third factor, that is, whether such a defense ... is "consistent with the underlying purposes of the legislative scheme to imply such a remedy", such a determination is at best doubtful. Although such a remedy would seemingly not destroy the legislative scheme, such remedy does clearly lie outside of that scheme. The only factor weighing in favor of [defendant's] position is the fourth, for the area of patent law is not one traditionally relegated to state law. However, since three of the four factors weigh against implying such a right on the part of [defendant], and since, for the most part, this test has been applied cautiously against recognition of a cause of action except where the text or legislative history suggests that Congress specifically intended one, this Court will not imply any right on the part of [defendant] in this instance.

*Laerdal Med. Corp.*, 877 F.Supp. at 259–60 (footnotes omitted). This Court agrees and adopts the conclusion and reasoning of the Maryland and Delaware district courts. The Patent Act does not give rise to an implied affirmative defense of erroneous reinstatement.

Returning to the first category, however, the action at bar requires this Court to consider the issue the Delaware court raised, but did not decide—"whether misrepresentations made by a patent holder in a reinstatement petition under section 41(c) could constitute inequitable conduct." *Id.* at 1256 n. 30. On March 3, 2000, Plaintiff filed a Petition asking the PTO to "Reconsider Previously Accepted Delayed Payment of Maintenance Fee in Light of a New Fact." In the Petition, Plaintiff explained that discovery conducted in preparation for the preliminary injunction hearing before this Court revealed that Plaintiff "should have known" by April 22, 1997 that the '726 Patent lapsed. Attached to the Petition are the declarations of two of Plaintiff's employees stating that they should have known about the lapse by late April or early May of 1997. (Decs. of Boggs, Filletti, attached to Petition).

Allied previously represented that it had not been aware of the lapse of the '726 Patent until it began investigating Defendants' purported infringement in the fall of 1998. Allied now states that it should have known of the lapse approximately one and one-half years earlier than it previously indicated, by a date no more than two to three weeks after the lapse on April 9, 1997. Because the PTO declined to address the Motion to Reconsider, its decision to reinstate the patent was based on information subsequently revealed to be incorrect.[8] However, Defendants have not offered evidence to challenge Boggs' and Filletti's statements that the oversight was

---

8. Rather, Maneely asserts, and Allied does not dispute, that on April 10, 2000, the PTO concluded that improper reinstatement of the '726 Patent is an issue that must be raised third party in an infringement action. However, this Court is not bound by the determination of the PTO.

unintentional. At most, the evidence indicates negligence. The Court concludes that this unintentional conduct does not constitute inequitable conduct falling within the "unenforceability" category of equitable defenses described in *California Med. Products, Inc.*, 921 F.Supp. at 1256. A conclusion to the contrary would conflict with the express language of the statutory provision allowing reinstatement within the relevant time period if the lapse was unintentional. *See* 35 U.S.C. § 41(c)(1). Allied has established a likelihood of success on the merits of the propriety of reinstatement, because it has shown that Defendant's challenge to reinstatement lacks substantial merit. *Genentech, Inc.*, 108 F.3d at 1364.

## C. Is Enforcement of the Patent Barred by the Doctrine of Absolute or Equitable Intervening Rights?

■ The Patent Act provides that, when a patent is reinstated after a lapse, parties who, during the lapse period, "made, purchased, or used" goods that would infringe the reinstated patent are entitled to "continue the use of, or to sell to others" those goods "so made, purchased, or used." 35 U.S.C. § 41(c)(2).[9] The rights conferred by this provision are known as "absolute intervening rights." The provision is designed to protect the rights of those who, in reliance on the lapse, first took steps to begin making, selling, or using the product during the lapse period, i.e., after the end of the six-month grace period but prior to reinstatement. *Fonar Corp. v. General Elec. Co.*, 107 F.3d 1543, 1554 (Fed.Cir. 1997), *cert. denied*, 522 U.S. 908, 118 S.Ct. 266, 139 L.Ed.2d 192 (1997). Legislative history states that the intervening rights provisions in § 41(c)(2) are similar to those in 35 U.S.C. § 252, concerning reissued patents. *Id.* (quoting H. Rep. No. 97–542, at 8 (reprinted in 1982 U.S.C.C.A.N. 772)). Absolute intervening rights extend only to goods already made at the time the reissue patent is granted. *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1221 (Fed.Cir.1993) (interpreting § 252).

The second sentence of 35 U.S.C. § 41(c)(2) grants courts discretion to "provide for the continued manufacture, use, offer for sale, or sale of the [good] . . . to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced" during the lapse period.[10] This section allows the court to grant a party potentially broad rights to continue manufacturing and selling goods that would otherwise

9. The statute provides, in relevant part:
A patent, the term of which has been maintained as a result of the acceptance of a payment of a maintenance fee under this subsection, shall not abridge or affect the right of any person or that person's successors in business who made, purchased, offered to sell, or used anything protected by the patent within the United States, or imported anything protected by the patent into the United States after the 6–month grace period but prior to the acceptance of a maintenance fee under this subsection, to continue the use of, to offer for sale, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported.

10. The second sentence of the statute provides:
The court before which such matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, or used within the United States, or imported into the United States, as specified, or for the manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made after the 6–month grace period but before the acceptance of a maintenance fee under this subsection, and the court may also provide for the continued practice of any process that is practiced, or for the practice of which substantial preparation was made, after the 6–month grace period but before the acceptance of a maintenance fee under this subsection, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced after the 6–month grace period but before the acceptance of a maintenance fee under this subsection.

infringe a reissued patent in order to protect investments made during the lapse period. *BIC Leisure Prods., Inc.*, 1 F.3d at 1221 (construing § 252). Although potentially much broader than the absolute right to sell goods already made, the rights granted by this second provision are not absolute; rather, they are known as "equitable intervening rights." *Id.* "'The purpose of [this portion of] the statute is to protect investments which have been made in good faith reliance on some perceived infirmity in the original patent.'" *Thayer v. Nydigger*, No. CIV 95-2004-AS, 1999 WL 372552 at *12 (D.Or.1999) (quoting *Halliburton Co. v. Western Co. of North Am.*, 10 U.S.P.Q.2d 1973, 1983 (W.D.Okla. 1988), *aff'd*, 935 F.2d 281 (Fed.Cir.1991)).

 If the Court concludes that reinstatement of the '726 patent was warranted, then Defendants argue that they are entitled to the absolute intervening right to sell the goods produced during the lapse period. They also argue that equitable considerations warrant the grant of equitable intervening rights. As Allied points out, however, courts only grant equitable intervening rights to parties acting in "good faith" who "innocently" develop and manufacture the infringing good. *Henkel Corp. v. Coral, Inc.*, 754 F.Supp. 1280, 1320 (N.D.Ill.1990) (citing *Seattle Box Co. v. Industrial Crating and Packing*, 756 F.2d 1574, 1579 (Fed.Cir.1985)). Allied argues that Razor Wire was neither innocent nor acting in good faith; rather, it argues, Defendant Perry Shumway instructed American's patent counsel not to pay the maintenance fee so that he could start a competing business manufacturing a product identical to the subject of the '726 patent. Defendants admit that Shumway instructed patent counsel to refrain from paying the fee. (Note by Cahill, Sutton & Thomas, attached as ex. to Petition to Accept Delayed Payment, Ex. 893); *see also* (Ex. B. to Maneely Co. Resp. to PI Mot., Ex. G to Pl. Reply). However, they dispute the assertion that Defendants were not acting in good faith.

By October, 1996, Shumway began hearing rumors that Allied might acquire American. (Tr. 91, 98). In October, 1996, Shumway investigated the extent of phone traffic between American, Allied, and its parent, Tyco. Shumway asked Harry Ray, who kept American's phone records, to check for calls between American and the area codes in which Allied and Tyco were located. (Tr. 136-39). Ray's search showed that there were a large number of calls between American, Allied and Tyco, and confirmed Shumway's suspicions. (Tr. 137-40).

Shumway may have begun discussions as early as October, 1996 with American employee Renne Cano about starting their own barbed tape business. (Tr. 91). By that time, Cano had worked in American's barbed tape manufacturing division for over twenty years, and was in charge of it. (Tr. 384).

By October, 1996, American had made and sold the subject matter of the '726 patent, Razor Ribbon, for approximately fourteen years. (Tr. 254). Razor Ribbon was American's main product at this time. (Tr. 526). Shumway knew well in advance that a maintenance fee was due on American's '726 Patent on October 9. American's patent counsel wrote Shumway on May 28, 1996, informing him that "[t]he third and final United States Patent and Trademark Office maintenance fee for Patent No. 4,509,726, entitled 'BARRIER' ... is due and payable on or before October 9, 1996," and that if the maintenance fee was not paid, "the patent will expire and all rights in the patent will be lost." (Ex. 10; Tr. 83-84). The letter asked Shumway for his instructions with regard to paying the fee. (*Id.*) On September 4, 1996, patent counsel sent Shumway a facsimile transmission. The cover sheet states: "Patent No. 4,509,-726 has a maintenance fee due 10/9/96. See out [sic] letter of 5/28/96." (Ex. 11; Tr. 84-85, 331-334).

On or about October 8, 1996, the day before the '726 Patent maintenance fee was due, Shumway requested that outside

counsel send him information about the '726 Patent. (Tr. 334, 337). In response, counsel sent a brief fax reminder to Shumway along with the front page of the '726 Patent. (Ex. 12, Tr. 85). Counsel's copy of the fax contains a note stating "per Perry Shumway 10-8-96—do not pay maintenance fee—message was left on my voice mail." (Ex. 12; Tr. 334-35). This note indicates that Shumway instructed counsel not to pay the fee. Based on Shumway's instruction, counsel did not pay the maintenance when it was due on October 9, 1996. (Tr. 335).

Shumway claims that his boss at the time, James Bradshaw, made the decision not to pay the maintenance fee, and that Shumway was merely following orders when he directed patent counsel not to maintain the '726 Patent. (Shumway Aff., Ex. 13 ¶ 2). However, the Court finds that Bradshaw was not actively involved. Bradshaw does not remember having any discussions with Shumway about whether to pay the maintenance fee for the '726 Patent. (*Id.*, 86-88). He does not recall making a decision to allow the patent to expire, and he added that it was not possible that he would have made such a decision on his own. (*Id.*, 88-89). Rather, Bradshaw testified, any decision to allow the '726 Patent to lapse had to go through David VanDenburgh, who was in charge of all the American companies. (*Id.*) VanDenburgh likewise was not involved in the decision to allow the maintenance fee to expire. (Tr. 525). Moreover, VanDenburgh confirmed that Bradshaw did not have authority to make a decision about whether to pay maintenance fees. (Tr. 530).

VanDenburgh's and Bradshaw's lack of involvement is further confirmed by the fact that, as VanDenburgh testified at the hearing, the decision not to pay the '726 Patent maintenance fee did not make good business sense for American. (Tr. 526). As stated above, the patented tape was American's main product. (*Id.*) Even with a slight increase as of August, 1996, the maintenance fee was only $3,315.00, an insignificant amount for a company the size of American with barbed tape sales of approximately $4 million and total sales approaching $120 million at the time. (Tr. 156; Ex. 10). Moreover, by October 1996, Allied's negotiations to acquire American also were well underway. (Tr. 155-56). Allied was negotiating to acquire American's manufacturing companies, including its barbed tape company, and all related assets and intellectual property. (Tr. 516-18). Regardless of whether those negotiations were successful, American's '726 Patent was a valuable asset. (Tr. 526).

In addition, American had acted to protect its rights under the '726 Patent through litigation three times before October 1996. Litigation against Man Barrier was settled and American purchased that company. (Tr. 282). In a settlement agreement between American and Michael Industries and American in 1988, Michael Industries agreed to discontinue making one of its razor tapes, and American agreed not to further contest other razor tapes. (Tr. 282-83; Ex. 269). In March, 1990, American entered a settlement agreement with Allied's subsidiary, Coastal, in which the latter agreed to pay American $80,000 and discontinue one of its products. (Tr. 284-85; Ex. 270). The litigation further confirms the value of the asset to American, and the lack of incentive on the part of the company to allow the patent to expire.

Unlike Bradshaw and VanDenburgh, however, Shumway had a motive to allow the '726 patent to expire. By doing so, Shumway could proceed with his new barbed tape business, manufacturing a razor tape that would have infringed on the patent had it remained in effect. Shumway admitted that he made the decision that his new barbed tape company would sell Razor Ribbon type barbed tape, at least in part, because that tape made up the majority of the sales in the marketplace. (Tr. 88). As explained above, Shumway also had the opportunity to facil-

itate expiration of the '726 Patent and he acted on it. The Court does not find Shumway's assertions to the contrary credible. The Court concludes that Shumway directed American's patent counsel not to pay the maintenance fee on the '726 patent with the goal of creating an opportunity for his new barbed tape company to sell a razor tape with all the elements of the '726 patent claims. Because Shumway was not acting "innocently" and in "good faith" when he start a company to sell a competing razor tape, Razor Wire is not entitled to equitable intervening rights. *Henkel Corp.*, 754 F.Supp. at 1320. Allied has established a high likelihood of success on this issue.

As Allied asserts, even the absolute intervening rights provision protects only those parties who began making, purchasing, or using the otherwise-infringing good after the patent lapsed, i.e., after the expiration of the six-month grace period but prior to reinstatement. *Fonar Corp.*, 107 F.3d at 1554. Parties who make, use or sell infringing goods as part of a "continuing commercial effort begun before the lapse" are not entitled to the protection of this provision. *Id.*

Within two to three months of instructing counsel not to pay the maintenance fee on the '726 Patent, i.e., in December, 1996 or January 1997, Shumway and Cano provided VanDenburgh a proposal about forming a partnership with their "new venture." (Ex. 7; Tr. 391–92). They offered to have their new venture make and sell to American the same type of barbed tape Razor Wire makes today. (Tr. 392–93; Ex. 7). On February 4, 1997, Allied's purchase of American's manufacturing companies became effective and Shumway became an Allied employee. (Ex. 522). Shumway began preparing a business plan for the new barbed tape venture, then named "Razor Wire International." (Ex. 46; Tr. 75). The plan states that Razor Wire would be a "reincarnation" of American Security Fence, one of American's former subsidiaries. (Ex. 46; Tr. 75).

On February 24, 1997, while Shumway was still working for Allied, Razor Wire, through Shumway, approached an existing American/Allied barbed tape customer, Patricia Calderon of Eximco Servicios Integrados ("Eximco"), and presented a proposal that Razor Wire partner with Eximco to be its "exclusive, high service provider." (Ex. 9 p. 4; Tr. 78–79). Shumway invited Calderon to invest in Razor Wire and become a co-owner with a one-third interest, or more. (*Id.* at 4–5). Shumway indicated that Razor Wire's "team" was "already assembled and ready to begin," (*Id.* at 3; Tr. 75–76), and that, by locating Razor Wire in Phoenix, the company could "set up the shop and ramp up to a full scale operation almost immediately." Although he refuted it during his hearing testimony, Shumway testified at his deposition that the proposal also was an offer to sell Calderon the same barbed tape that Razor Wire sells today. (Tr. 76, 78–79).

Razor Wire sold its first barbed tape product in about June 1998, to the State of Florida, after having secured the contract a few months earlier. (Tr. 114–15, 394). At that time Razor Wire's production facility was not yet running, so Razor Wire acquired barbed tape from American, product made by Allied, and shipped it to Florida as its own. (Tr. 115). Allied had bid on the Florida contract against Razor Wire and lost. (*Id.*)

Shumway and Cano were seeking investors and customers for Razor Wire beginning with VanDenburgh in December, 1996 or January 1997, and continuing with Eximco in February, 1997. This solicitation of investors and customers constitutes "commercial effort", *see Fonar Corp.*, 107 F.3d at 1554, begun prior to the expiration of the six-month grace period following nonpayment of the maintenance fees in October, 1996; thus, Razor Wire's subsequent manufacture and sale of the barbed tape is part of a "continuing commercial effort begun before the lapse" of the '726 patent. *Id.* As a result, Razor Wire is not entitled to the statutory absolute interven-

ing right to sell the product manufactured during the lapse period. Allied has established a likelihood of success on the merits of this issue.

Maneely requests that the Court grant equitable intervening rights to Razor Wire so that Maneely can recoup its $675,000 outstanding investment in Razor Wire. (Tr. 909). Maneely provided Razor Wire the capital required to create its barbed tape manufacturing business via loans and a line of credit. (Tr. 877–881, Ex. 115, 122). Razor Wire was responsible for manufacturing the barbed tape, and Maneely was responsible for sales and marketing. (Tr. 930–931, Ex. 75 at 2, Ex. 230). Razor Wire agreed to use Maneely's business name of "Wheatland." (Tr. 878, 922). Razor Wire was known to the barbed tape industry as Wheatland Razor Tape, and Maneely as Wheatland Tube. Maneely states that Razor Wire represented that there were no patent issues, and that Maneely had no knowledge of problems with the '726 patent prior to the lawsuit. (Tr. 909–10, 917; Ex. 300 at 68). However, Maneely has not argued that Razor Wire can be accorded intervening rights merely to protect an investor when such rights would not otherwise be accorded to it. The Court also notes that Maneely obtained a security interest for its loan, in the form of a general lien on virtually all of Razor Wire's property, and personal guarantees by Shumway, Cano, and their spouses. (Exs.116, 118, 119). Maneely is not entitled to intervening rights given the Court's findings about Razor Wire's conduct.

## II. Irreparable Injury

 Because Allied has established a strong likelihood of success of proving infringement and prevailing on validity, it is entitled to a presumption of irreparable harm. *Canon*, 134 F.3d at 1090. Absent evidence "clearly negating irreparable harm," there is no basis for finding that the presumption of irreparable harm is overcome. *Polymer Tech., Inc. v. Brid-*

*well*, 103 F.3d at 974, 975 (Fed.Cir.1996) (vacating denial of preliminary injunction because evidence court relied upon was legally insufficient to rebut presumption of irreparable harm). Two of the three circumstances that may be sufficient to rebut the presumption of irreparable harm do not exist here: contemporaneous cessation of the infringing activities, or a pattern of licensing. *Polymer Tech.*, 103 F.3d at 974.

Defendants argue that the presumption is rebutted because Allied delayed bringing suit. Defendants point out that Allied first became aware of the existence of Razor Wire when Shumway telephoned Boggs, Allied's Director of Business Development, in January 1998 to tell him about Razor Wire's formation and ask whether Allied was interested in buying barbed tape from Razor Wire. (Boggs Dep., March 22, 2000, 63–64; Tr. 772). By the first quarter of 1998, Larry Knapp, General Manager of Allied's Fence Division, perceived that Razor Wire was a competitor. (Knapp Dep. 19–20, 30–31). Deb Skowronski, an Allied employee responsible for providing quotations for, and managing inventory of Allied's barbed tape, first became aware of Razor Wire in Spring 1998 from a bid list from the Florida Department of Corrections. (Skowronski Dep. 10–11, 18). By mid–1998, she mentioned Razor Wire to Rick Mullins, her immediate superior. (Skowronski Dep. 11, 28). Around that same time, Allied was beginning to receive market information that it was losing orders to Razor Wire. (*Id.* at 30). Allied initially declined to meet or beat Razor Wire's price in the market. (Skowronski Dep. *Id.* at 30; Knapp Dep. 37–38; Mullins Dep. 25). Allied maintained that strategy for a period of time in the hope that RAZOR WIRE would adjust its price, but subsequently began lowering its prices. (Skowronski Dep. 30; Knapp Dep. 37–39).

Defendants arguments about undue delay are considerably weakened by the fact that Razor Wire did not start producing barbed tape until after the middle of 1998.

Allied could not determine whether Razor Wire was offering an identical product until Razor Wire had product to sell. Allied obtained a sample of Razor Wire's product in September or October, 1998, and concluded that it was indistinguishable from Allied's product. (Tr. 154, 274–75). Moreover, Allied had to investigate the circumstances surrounding the expiration of the '726 patent, and then request reinstatement. (Tr. 275–76). When the PTO reinstated the patent on October 26, 1999, Allied sued for infringement the next day, as soon as they could—October 27, 1999. Allied did not undue delay in challenging Razor Wire. *See E.I. du Pont de Nemours & Co. v. Polaroid Graphics Imaging, Inc.,* 706 F.Supp. 1135, 1145 (D.Del.1989) (granting preliminary injunction and finding no delay where patentee waited to file suit until after conclusion of action in PTO related to patent and as soon as "there was an economic reason to take action"). Therefore, the presumption of irreparable injury is not overcome.

### III. Conclusion

Allied has established both a likelihood of success on the merits of the challenges to the patent's validity and on Defendants' arguments regarding absolute or equitable intervening rights. Allied also has established irreparable injury. Therefore, the Court will grant Allied's Motion for Preliminary Injunction.

Accordingly,

**IT IS ORDERED** granting Plaintiff's Motion for Preliminary Injunction. (Dkt.# ).